IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DALE D. SMITH,                        )
                                      )
        Plaintiff,                    )
                                      )
        vs.                           )    Civil Action No. 08-347
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
        Defendant.                    )

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Dale D. Smith and Defendant Michael J. Astrue, Commissioner of Social Security. Plaintiff seeks review of final decisions by the Commissioner denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below, Plaintiff's motion is granted, Defendant's motion is denied, and the case is remanded to the Commissioner for further consideration.

## II.   BACKGROUND

### A.    Factual Background

Dale Smith dropped out of school following the ninth grade, but later earned her GED in 1995. (Certified Copy of Transcript of Proceedings before the Social Security

Administration, Docket No. 5, "Tr.," at 181.) She worked intermittently as a cashier at a truck stop, in a department store, and for a convenience store between 1997 and 2002.

As early as January 2001, when she was about 24 years old, Ms. Smith began complaining to her primary care physician about constant headaches, sometimes accompanied by shaking and photophobia. (Tr. 292.) She was treated by Dr. Thomas Chesar for migraine headaches with a variety of medications, many of which either caused side effects or failed to provide any relief. In February 2001, Plaintiff also reported that she thought her depressive symptoms were returning and Dr. Chesar began treating her with Prozac. (Tr. 290.) By September 2001, Plaintiff reported that she had become "very moody," with decreased appetite and poor sleep; again her medications were changed. (Tr. 288.)

Sometime before October 2001, Ms. Smith began receiving psychological counseling from the Venango Counseling Center while continuing to work as a cashier at a truck stop, but by September 2002, she had stopped going to counseling and regularly taking her prescribed medication. Her depression returned and Dr. Chesar concluded she should be considered temporarily disabled until the beginning of December 2002. (Tr. 285-286.)

Plaintiff began seeing Dr. John Schibli as her primary care physician in February 2003. At her request, Dr. Schibli continued her disability status for three months so she could return to

counseling on a regular basis and stabilize her medication regime. (Tr. 201-202.) Again, Ms. Smith stopped going to counseling and taking her medication when she began to feel better in the spring of 2003, only to return to Dr. Schibli when she began experiencing depressive symptoms, migraine headaches, and insomnia; he also treated her for hypothyroidism, obesity, and asthma. (Tr. 197-200.) In March 2004, Dr. Schibli extended Plaintiff's disability once more (Tr. 196) and by July, her hypothyroidism, asthma, and depression seemed to have improved (Tr. 193.)

Apparently at the suggestion of her mental health counselor, Plaintiff underwent a three-day consultative psychological examination by Albert J. Scott, Ed.D., in July and August, 2004. (Tr. 174-180.) Dr. Scott's conclusion (discussed in more detail below) was that Plaintiff was suffering from major depression together with delusional, cognitive and personality disorders. He suggested that she undergo a sleep study as well as an MRI and EEG to rule out physical causes for her headaches and cognitive disorder, all of which were performed in November 2004 through January 2005.

In January 2005, Dr. Schibli reported that Plaintiff's depression (which was now characterized as bipolar) had improved, her chronic anxiety was controlled, and her hypothyroidism was being successfully treated; she continued, however, to experience migraine or cluster-type headaches, sometimes on a daily basis.

(Tr. 256-257.)

## B. Procedural Background

Plaintiff filed protective applications for disability insurance benefits and for supplemental security income on April 1, 2005, alleging disability as of May 3, 2002, due to chronic asthma, depression, insomnia, allergies, migraines, an inability to focus or concentrate, and short-term memory problems.[1]  (Tr. 115-120; 77-79; 310-311.)  Following denial of both applications at the state agency level, she sought a hearing before an Administrative Law Judge ("ALJ") which was held by the Honorable Lamar W. Davis on July 19, 2007.  On October 16, 2007, Judge Davis issued his decision, again denying benefits.  (Tr. 18-29.)  The Social Security Appeals Council declined to review the ALJ's decision on January 8, 2008,[2] finding no reason pursuant to its rules to do so. (Tr. 5-8.)  Therefore, the October 16, 2007 opinion became the final decision of the Commissioner for purposes of review.  42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on March 7, 2008, seeking

---

[1]  Plaintiff had previously filed applications for DIB and SSI on June 28, 2004, which were denied at the initial level of review on January 11, 2005.  (*See* Tr. 82-84, 321-322, 70-74, and 315-319, respectively.)  The ALJ determined that there was no basis for re-opening those applications or reviewing their denials.  (Tr. 18.) Plaintiff does not raise any objections to this finding.

[2]  The letter from the Appeals Council is dated January 8, 2007, which the Court concludes from all the evidence in this case is a typographical error.

4

judicial review.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

5

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A.   The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[3] currently existing

---

[3]   According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

6

in the national economy.[4] The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). To be granted a period of disability and receive disability insurance benefits, a claimant must also show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Ms. Smith satisfied the first two non-medical requirements and the parties do not object to the ALJ's finding that Plaintiff's date last insured was December 31, 2007. (Tr. 20.)

To determine a claimant's rights to either SSI or DIB,[5] the ALJ conducts a formal five-step evaluation:

  (1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

  (2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, she is not disabled;

  (3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed

---

[4] The claimant seeking supplemental security income benefits must also show that her income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

[5] The same test is used to determine disability for purposes of receiving either DIB or SSI benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

7

in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[6] to perform her past relevant work, she is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[7] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Davis concluded at step one that Ms. Smith had not engaged in substantial gainful activity since her alleged disability onset date of May 3, 2002. (Tr. 20.) Resolving step two in Plaintiff's favor, the ALJ concluded she suffered from lumbar strain, asthma, hypothyroidism,

[6] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[7] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, citing Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

8

gastroesophageal reflux disorder ("GERD"), migraine headaches, major depressive disorder, generalized anxiety disorder, personality disorder, and cognitive disorder, all of which were "severe" as that term is defined by the Social Security Administration.[8]  (Tr. 20.)

At step three, the ALJ concluded Plaintiff's physical impairments did not satisfy any of the criteria in Listing 1.00 (musculosketal system – lumbar strain); Listing 3.00 (respiratory system – asthma); Listing 5.00 (digestive system – GERD); Listing 9.00 (endocrine system – hypothyroidism); or Listing 11.00 (neurological system – migraine headaches.)  He further concluded Plaintiff's cognitive disorder, depression, anxiety, and personality disorder did not satisfy, respectively, Listings 12.02 (organic brain disorders), 12.04 (affective disorders), 12.06 (anxiety related disorders) or 12.08 (personality disorders.)  (Tr. 21.)

At step four, the ALJ concluded Ms. Smith had

the residual functional capacity to perform light work requiring only simple routine repetitive tasks[,] that

---

[8] See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience.  Yuckert, 482 U.S. at 149-151.  The claimant has the burden of showing that the impairment is severe.  Id. at 146, n.5.

9

involves independent judgment, discretion and changes in work processes no more than 1/3 of an 8-hour workday, that does not require interaction with the general public, interaction with co-workers no more than 1/6 of an 8 hour workday, that avoids exposure to hazards such as heights and dangerous machinery, and that avoids temperature extremes, excessive humidity, fumes, airborne particulates, dusts, odors and gases.

(Tr. 22.)

At the hearing, Fred Monaco, Ph.D., a vocational expert, had testified that Plaintiff's past relevant work as a cashier was considered unskilled light work[9]. (Tr. 356.) However, the ALJ concluded Ms. Smith could not return to that work given the residual functional capacity he had previously adopted. (Tr. 28.) In response to the ALJ's hypothetical questions at the hearing, Dr. Monaco testified there were numerous unskilled jobs which an individual of Ms. Smith's education, experience, and non-exertional limitations could perform in the local or national economy. He provided the examples of unarmed guard, "hand working" occupations, and bench assembler, all of which were light, unskilled occupations that met the environmental and workplace interaction restrictions

---

[9]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b) and 416.967(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

10

the ALJ had described. (Tr. 29; *see also* Tr. 358.)

Based on Plaintiff's status as a younger individual[10] with the equivalent of a high school education, the ability to communicate in English, a work history which provided no readily transferable skills, the medical evidence of record, and the testimony of the vocational expert, the ALJ determined at step five that Ms. Smith had not been disabled at any time between May 3, 2002, and the date of his opinion; consequently, she was not entitled to benefits. (Tr. 28-29.)

### B. Plaintiff's Arguments

In the brief in support of her motion for summary judgment, Ms. Smith identifies some 15 different errors or omissions by the ALJ which in turn support her three primary arguments. First, having found at step two that Ms. Smith suffered from several severe impairments, the ALJ should have considered whether those impairments, in combination, were equivalent to a Listing. This question, Plaintiff submits, established a duty on the part of the ALJ to secure a medical expert evaluation. (Plaintiff's Brief, Docket No. 10, "Plf.'s Br.," at 18, *citing* Schwartz v. Holter, 134 F. Supp.2d 640, 659 (E.D. Pa. 2001), and Maniaci v. Apfel, 27 F.Supp.2d 554, 557 (E.D. Pa. 1998).)

Plaintiff's second argument is that the ALJ erred by failing

---

[10] Plaintiff was 25 years old on her alleged onset date and 30 years old on her date last insured, making her a "younger" person according to Social Security regulations. 20 C.F.R. § 404.1563(c).

11

to follow well-established Social Security regulations and case law for weighing medical opinions. Ms. Smith contends the ALJ erred by failing to provide an adequate explanation for disregarding some evidence; applying his own personal observations in analyzing the medical evidence; making speculative inferences from the medical reports; and giving preference to the opinions of non-examining, non-treating state agency physicians over those of Plaintiff's long-term treating physicians and consulting psychiatrists. (Plf.'s Br. at 18-19.)

Finally, Ms. Smith argues that had the ALJ given the proper weight to the medical reports, he would have concluded that her mental health impairments precluded all substantial gainful employment, particularly when combined with the limitations imposed by her migraine headaches. (Id. at 20-21.)

Plaintiff seeks either an immediate award of benefits or, alternatively, remand for further consideration. (Id. at 21.)

C.  Analysis

We need not address Plaintiff's arguments or the ALJ's alleged errors in detail because we conclude this case must be remanded for further consideration of the medical evidence, particularly the report by Dr. Scott.

1.  *Relevant Medical Evidence:*[11]  On September 7, 2004,

---

[11] Although Plaintiff raises the general argument that the hypothetical question posed by the ALJ to the vocational expert at the hearing failed to include all of her functional limitations, including those from "the severe problems he found" (Plf.'s Br. at 15), she does

12

Dr. Scott reported on three days of diagnostic tests he had administered at the request of Plaintiff's case manager in order to develop her treatment plan. (Tr. 174-180.) In addition to conducting a mental status exam and taking an extensive medical history based on Plaintiff's subjective reports, Dr. Scott administered fourteen objective psychological tests.[12] While he found the results on some of these tests were within normal limits (e.g., the Wisconsin card sorting test and the line bisection test), others showed significant deviation from the norms (e.g., the finger tapping test, part B of the trail making test, and the Boston naming test.) Dr. Scott concluded the results of the Millon Clinical Multiaxial Inventory-III test[13] ("MCMI-III") were valid,

_____

not identify which functional limitations the ALJ failed to include that would have arisen from her lumbar strain, asthma, hypothyroidism, and GERD, but instead concentrates only on the medical evidence pertaining to her mental impairments and headaches. Inasmuch as Plaintiff has failed to pinpoint limitations from those impairments which should have been included or about which the ALJ should have reached different conclusions, the medical evidence pertaining to those impairments will not be discussed.

[12] These included the Wisconsin card sorting test, "finger tapping test," Minnesota Multiphasic Personality Inventory-2, parts A and B of the "trail making test," "house-tree-person" test, Boston naming test, incomplete sentences test, Rey complex figure test and recognition trial, the MCMI-III, line bisection test, thematic apperception test, Rorschach inkblot test, an adult questionnaire, and a writing sample. (Tr. 174.)

[13] According to the online encyclopedia, wikipedia.org, "the Millon Clinical Multiaxial Inventory-III is a psychological assessment tool intended to provide information on psychopathology, including specific disorders outlined in the DSM-IV....The test is modeled on four scales: 14 Personality Disorder Scales, 10 Clinical Syndrome Scales, Correction Scales (which help detect inaccurate responding) and 42 Grossman Personality Facet Scales....The major scales are divided in four ranges: normal (0-60), tendency (61-75), trait

13

and showed "greatly elevated" scores on 15 of the 24 scales. Other tests showed problems with recall, concentration, and visual memory.

Dr. Scott concluded the results of his tests could "basically be explained as the result of a major depression and delusional disorder. There are neuropsychological deficits." (Tr. 177.) He further noted Ms. Smith

. . . is in need of a sleep study. She needs psychiatric treatment to target her depression, psychotic processing, suicidal thoughts, and sleep pattern disturbance. She needs individual and marital counseling. She needs trauma therapy. In addition to the appropriate psychiatric and psychological treatment, she needs a neurological evaluation including fMRI and EEG. It is my professional opinion, within a reasonable degree of professional certainty, that the subject is psychiatrically disabled.

(Tr. 177-178.)

Dr. Scott diagnosed Plaintiff with major depressive disorder, recurrent; delusional disorder, persecutory type; cognitive disorder NOS; and personality disorder NOS. He further noted her physical medical conditions, i.e., migraine headaches, asthma and thyroid, moderate psychosocial stressors, and a current GAF of 35.[14]

_____

(76-85), and personality disorder (86-115)." See wikipedia entry for Millon Clinical Multiaxial Inventory, last visited November 3, 2008.

[14] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). A GAF score between 31 and 40 reflects "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations,

(Tr. 177.)

2. *The ALJ's Treatment of the Medical Reports:* In his opinion, Judge Davis summarized Dr. Scott's report, noting in particular his diagnoses, his conclusion that Ms. Smith was psychiatrically disabled, and her GAF of 35. (Tr. 25.) He gave limited weight to Dr. Scott's conclusions (along with those of three other consultants and Ms. Smith's psychotherapist) because they were "not supported by the objective findings." (Tr. 26.) Instead, he relied on the reports of Dr. Gerald Francis, Robert P. Craig, Ph.D., and two state agency psychologists who had found Ms. Smith's severe mental impairments were not disabling. (Tr. 27.)

One of the opinions given limited weight by the ALJ was that of Julie Uran, Ph.D., a one-time consulting psychologist. Her report of November 2004 acknowledged Dr. Scott's report and, although she described Plaintiff's GAF as in the range of 50 to 55, indicating only moderate symptoms, she also concluded that Ms. Smith's prognosis in terms of higher level functioning and personality integration was poor and that she would have marked or extreme limitations in her ability to understand, remember and

---

judgment, thinking, or mood (e.g., . . . avoids friends, neglects family, and is unable to work; . . . .") See the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited November 4, 2008. Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score. See Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

15

carry out detailed instructions, make judgments on simple work-related decisions, interact appropriately with the public or co-workers, and respond appropriately to work pressures or changes in a usual work setting. (Tr. 181-188.)

Two other consulting psychologists, Dr. Craig and Dr. Francis, however, whose reports date from July 2005 and June 2007, respectively, found Ms. Smith far less impaired. Dr. Craig did not administer any objective tests, but reviewed Plaintiff's records and conducted a structured clinical interview. The history of her mental impairments was generally consistent with those provided to other doctors. She reported at the time symptoms of low appetite, poor sleep, poor energy, difficulty focusing and occasional suicidal ideation, but no impulse control problems. She had some difficulties in her basic ability to think and reason, e.g., understanding similarities, explain proverbs, spell, and do simple mathematical processes. Dr. Craig's diagnosis was of major depressive disorder, recurrent, mild to moderate, with a current GAF of 57, and only slight to moderate limitations in her ability to understand, remember, and carry out detailed instructions. He found that because she would have difficulty focusing, she would have difficulty completing tasks and could not manage her benefits in her best interest, the latter based, presumably, on Ms. Smith's report that she was "not very good with money." (Tr. 259-264.)

Dr. Francis's psychiatric evaluation was based on Ms. Smith's

16

subjective statements which were consistent with her earlier reports. She denied suicidal ideation, but admitted to passive death wishes; she reported panic attacks and agoraphobia, but no obsessive/compulsive disorder, post-traumatic stress disorder, or bi-polar symptoms. In the mental status examination, he found Ms. Smith to participate well in the interview, with clear and precise speech although she spoke in a very low tone; she demonstrated organized and goal directed thoughts, and described her mood at 7 out of 10 where 10 was normal. Her affect was blunted and she showed no paranoia; her insight, judgment and impulse control were described as average. She denied auditory or visual hallucinations at present, but reported that at home she experienced both types.[15] Dr. Francis's diagnoses included dysthmia, major depressive disorder with psychotic features, social phobia, panic disorder with agoraphobia, and personality disorder NOS; her GAF was 50. (Tr. 302-303.)

Darla Dodds, a licensed professional counselor,[16] treated Ms.

---

[15] Dr. Uran noted that Ms. Smith had reported voices calling her name and seeing shadows in November 2004. (Tr. 182.) Ms. Smith reported similar hallucinations to Dr. Scott. (Tr. 175.)

[16] Social Security regulations state that evidence of a claimant's impairment may be provided by "other" medical sources, including, among others, licensed clinical social workers and therapists. 20 C.F.R. § 404.1513(d). In the past, this evidence was given little weight compared to that provided by "acceptable medical sources." However, Social Security Ruling 06-03p, "Considering Opinions and Other Evidence from Sources Who Are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Non-governmental Agencies," reflects recent changes in how medical care is provided in this

17

Smith and her family from October 26, 2004, through November 13, 2006. At the initial interview, Ms. Dodds noted Ms. Smith's report of a long history of depression, panic attacks, and social anxiety, her numerous medications for treatment, and her past attempts at psychotherapy. Her initial diagnoses were major depressive disorder, recurrent, severe, without psychotic features, and generalized social phobia; Plaintiff's GAF was reported as 48, indicative of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious impairment in social, occupational, or school functioning. (See DSM-IV.) When Ms. Dodds wrote a summary letter to Plaintiff's counsel in July 2007, she noted Ms. Smith had a sporadic history of keeping

country. That is, managed health care and the emphasis on containing medical costs has resulted in medical sources such as nurse practitioners, physician assistants, and licensed clinical social workers assuming a greater percentage of the treatment and evaluation functions previously handled by physicians and psychologists. The opinions of these medical sources, although not technically "acceptable medical sources" under Social Security rules, are to be evaluated on key issues such as impairment severity and functional effects, although their opinions cannot establish the existence of a medically determinable impairment. The weight given to such evidence will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors. Furthermore, the opinions are to be evaluated using the same factors as those used in weighing the opinions of acceptable medical sources, e.g., how long the source has known and how frequently he has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well he explains his opinion; whether he has a specialty or area of expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion. Finally, the ALJ's discussion of these opinions should include information about the weight given to them so subsequent reviewers may understand the ALJ's reasoning, particularly when those opinions may have an effect on the outcome of the case.

18

appointments, due in part to her anxiety levels, depression, or migraine headaches. When her depression increased sufficiently, she and her husband would return to counseling "after a month or so [of] not coming." Despite medication and counseling over several years, Ms. Smith told Ms. Dodds she did not feel as if these treatments "really made a difference." (Tr. 248-250; 298-299.)

The first state agency psychologist's file review was conducted in December 2004. (Tr. 218-236.) In the narrative portion of his report, Sanford Golin, Ph.D., referred to Dr. Uran's opinion and found her conclusions about Plaintiff's limitations in occupational, personal and social adjustments were "not consistent with all of the medical and non-medical evidence in the claims folder." He also found her report "appears to contain inconsistencies;" her conclusions were based only on "a snapshot" of Ms. Smith's ability to function; the report was "an overestimate of the severity" of Plaintiff's limitations; and Dr. Uran's opinion "contrast[ed] sharply with other evidence in the record." (Tr. 233.) However, he did not identify the inconsistencies or the evidence which "sharply" contrasted with Dr. Uran's opinions. Most strikingly, although Dr. Golin referred to Dr. Scott's report in his notes (Tr. 235), it was not mentioned at all in his narrative. Dr. Golin concluded that Ms. Smith was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (Tr. 234.) He

19

considered her understanding and memory, sustained concentration and persistence, social interaction, and adaptation abilities to be at most only moderately limited with the exception of her abilities to understand, remember and carry out detailed instructions which he found to be markedly limited. (Tr. 231-232.)

A second state agency file review was performed in September 2005. (Tr. 265-280.) Roger Glover, Ph.D., noted that Dr. Craig's report was "given great weight and adopted in this assessment." (Tr. 280.) He also found that statements by unnamed "examining sources" about Ms. Smith's abilities to make occupational, personal and social adjustment were "not consistent with all of the medical and non-medical evidence in the claims folder." In arriving at his conclusion that Ms. Smith could meet the basic mental demands of competitive work on a sustained basis despite her limitations, Dr. Glover noted he had received the reports of Drs. Craig and Scott (although there is no mention of Dr. Uran's report) (Tr. 277), but like Dr. Golin, he failed to refer to Dr. Scott's conclusions at any point in his narrative.

3. *Application of Law to Facts:* It is well-established in this Circuit that an ALJ has certain obligations when considering the medical evidence in a claimant's record. As the United States Court of Appeals for the Third Circuit recently summarized,

the ALJ may not substitute his or her own expertise to refute such record evidence. . . .Limitations that are

20

medically supported but are also contradicted by other evidence in the record may or may not be found credible--the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason. . . .Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it.

Rutherford, 399 F.3d at 554, *citing* Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), and Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1992) (internal quotations omitted).

We conclude this is one of those instances in which the ALJ rejected medical evidence for the wrong reason. It is clear from the record that Dr. Scott's opinion is well-supported by objective evidence in the form of numerous psychological tests, at least some of which would seem to support his conclusions regarding the severity of Plaintiff's mental impairments, for example, the results of the MCMI-III falling in the "personality disorder" range on 15 of the 24 scales. (Tr. 180.)

On the other hand, the test results and the implications thereof are not always clearly explained in Dr. Scott's report. For example, he reported that the result of the "MMPI-2 was invalid with F=T=120" (Tr. 177) and that her "score on trail making B was more than two standard deviations below the mean." (Tr. 176.) Just as administrative law judges are cautioned not to substitute their own lay opinions for the opinions of medical experts, we find

21

it beyond the scope of this Court's expertise and purview to interpret the results of Dr. Scott's tests, much less infer from them how they reflect on Plaintiff's ability to perform work-related tasks on a regular and continuing basis, i.e., 8 hours a day, 5 days a week or an equivalent schedule. *See* Morales, 225 F.3d at 317 ("an ALJ may not make speculative inferences from medical reports" and may not rely on "his or her own credibility judgments, speculation or lay opinion") (internal quotation omitted.) This caveat is especially true in cases involving mental disorders. Id. at 317 (citations omitted.) The Court is unable to pinpoint any other *objective* medical evidence in the record which contradicts the results of the tests administered by Dr. Scott, nor any other physician's discussion of those results which would help the ALJ and this Court understand their implications.

Consequently, we agree with Plaintiff that the ALJ erred by rejecting Dr. Scott's analysis because it was not supported by objective evidence. We further conclude that the assistance of a medical expert would be helpful to the ALJ in not only understanding the test results, but also in determining if Plaintiff's multiple diagnoses of dysthmyia, major depressive disorder (with or without psychotic features), social phobia, and panic disorder with agoraphobia medically equal a mental impairment Listing.

As our Court of Appeals has pointed out under similar facts,

an ALJ has a duty to investigate the facts and develop arguments both for and against granting benefits, along with the duty to explain why he credited some, but not other, medical evidence. Johnson v. Barnhart, No. 02-2123, 2003 U.S. App. LEXIS 1635, *7 (3d Cir. Jan. 29, 2003), *quoting* Sims, 530 U.S. at 111. Consistent with these duties, the ALJ must explain his decision to credit some test results while not crediting others. Id. Even though the ALJ may provide an otherwise thorough review, occasionally the medical evidence may be inconclusive on the question of whether the disability satisfies a Listing. Social Security regulations allow the ALJ, in his discretion, to "ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s)," and whether they meet the requirements of a Listing. 20 C.F.R. § 404.1527. Although the ALJ generally has broad discretion whether to consult a medical expert, the Court of Appeals has held that in some circumstances, Social Security regulations and rulings require him to do so in order to meet his obligation to fully develop the administrative record. Johnson,, id. at *8-*9, *citing* Social Security Ruling[17] 96-9p; *see also*

---

[17] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

23

Maniaci, 27 F. Supp.2d at 557 (when "the record as it exists at the time of the administrative hearing fairly raises the question of whether a claimant's impairment is equivalent to a listing, a medical expert should evaluate it.")

Here, Dr. Scott's report, supported by objective test results, strongly suggested the possibility that Plaintiff's mental impairments satisfied Listing 12.04 or 12.06, as reflected in his conclusion that she was "psychiatrically disabled." Dr. Uran explicitly found that Plaintiff had numerous limitations in activities of daily living, social functioning, concentration and pace, some of which she indicated were "overwhelming," marked, or extreme. (Tr. 185-187.) These psychologists' reports, taken together, fairly raise the question of whether Plaintiff's impairments are equivalent to a Listing.

A reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984). Whether Plaintiff's mental impairments, as described by Drs. Scott and Uran, indicate that she is entitled to benefits is a question to be addressed by the ALJ rather than this Court. Therefore, we decline to award benefits directly, but remand to the ALJ for further

24

consideration, including consultation with a medical expert to interpret Dr. Scott's report and, as necessary, other medical evidence in the record.

An appropriate order follows.

November ___ 6 ___, 2008          _William J. Standish_

William L. Standish
United States District Judge